IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TIMOTHY HAYDEN, | Civil Action No. 4:18-cv-883 |
| Plaintiff, | |
| v. | |
| GENNEX MEDIA, LLC; ZAAPPAAZ, INC.; CUSTOM WRISTBANDS INC.; NETBRANDS MEDIA CORP.; CASAD COMPANY, INC.; BRANDECO, L.L.C.; AZIM MAKANOJIYA; MASHNOON AHMED; CHRISTOPHER ANGELES; and AKIL KURJI, | **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Timothy Hayden ("Plaintiff") brings this action under section 1 of the Sherman Act for himself and others who bought customized promotional products directly from defendants and their co-conspirators during the class period and alleges as follows:

**REASON FOR ACTION**

1. Beginning no later than June 2014, a Houston-centric cartel selling tens of millions of dollars in customized promotional products, including silicone wristbands, lanyards, and pin buttons ("CPPs"), used secret meetings, covert texts, and furtive online calls and messages to fix the prices they charged charitable organizations like Plaintiff's and others for CPPs. Already, four of the cartel members have pleaded guilty in this Court for their roles in the scheme. But neither they nor their co-conspirators have compensated the victims of the cartel for their losses. To restore competition and remedy the harm to Plaintiff and other direct purchasers

1

of CPPs, Plaintiff brings this action for treble damages, attorneys' fees, and other appropriate relief.

## PARTIES

2. Plaintiff Timothy Hayden is an individual citizen of the Commonwealth of Kentucky. He resides in Owensboro, Kentucky and is the President of the Necrotizing Fasciitis Foundation ("NFF"), which he founded. Plaintiff bought customized silicone wristbands directly from Defendant Zaappaaz, Inc., through its Wrist-Band.com website during the Class Period and donated them to NFF.

3. Defendant Gennex Media, LLC ("Gennex") is a Texas limited liability company with headquarters in Houston. It does business as brandnex.com. Defendant Brandeco, L.L.C., and GennexGroup, L.L.C., are affiliates of Gennex.

4. Defendant Zaappaaz, Inc. ("Zaappaaz") is a privately-held Texas corporation with its principal place of business at 1305 El Camino Village Drive, Houston, Texas 77058-3081. Zaappaaz does business online under the names "WB Promotions, Inc.," "Wrist-Band.com," and "Customlanyard.net," selling CPPs throughout the United States.

5. Defendant Azim Makanojiya is the president of Zaappaaz and is domiciled in the State of Texas.

6. Defendant Brandeco, L.L.C. ("Brandeco") is a Texas limited liability company with its principal place of business at 8181 Commerce Drive, Suite 700, Houston, Texas 77036. Brandeco does business online under the name "BrandNex.com," selling CPPs throughout the United States.

7. Defendant Akil Kurji is the chief executive officer of and controls Brandeco and Gennex and is domiciled in Texas.

8. Defendant Custom Wristbands Inc. ("Custom Wristbands") is a California corporation with its principal place of business at 4416 West Verdugo Avenue, Burbank, California 91505. Custom Wristbands does business online under the names of "Kulayful Silicone Bracelets," "Kulayful.com," "Speedywristbands.com," "Promotionalbands.com," "Wristbandcreations.com," and "1inchbracelets.com," selling CPPs throughout the United States.

9. Defendant Christopher Angeles is the owner and chief executive officer of Defendant Custom Wristbands and is domiciled in the State of California.

10. Defendant Netbrands Media Corp. ("Netbrands") is a Texas corporation with its principal place of business at 14550 Beechnut Street, Houston, Texas 77083-5741. Netbrands does business online under the names "24hourwristbands.com" and "imprint.com," selling CPPs throughout the United States. On information and belief, Netbrands previously operated as Lightbeam Inc. ("Lightbeam"), a former Delaware corporation that had a principal place of business at 4850 Wright Road, Suite 100, Stafford, Texas 77477-4116. Lightbeam also did business as "lightbeamlabs.com."

11. Defendant Mashnoon Ahmed is the president of Netbrands and is domiciled in Texas.

12. Defendant Casad Company, Inc. ("Casad") is an Ohio corporation with its principal place of business at 450 South Second Street, Coldwater, Ohio 45828. The founder and president of Casad is Thomas Casad. Casad does business online under the name "totallypromotional.com," selling CPPs throughout the United States.

## JURISDICTION AND VENUE

13. Plaintiff's claim arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff seeks treble damages, attorneys' fees, and other relief under Section 4 of the Clayton

Act (15 U.S.C. § 15(a)). This Court has subject matter jurisdiction over this claim under 28 U.S.C.§§ 1331 and 1337(a).

14. Venue properly lies in the Southern District of Texas under 28 U.S.C. §1391(b) and 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District and (b) a substantial portion of the events described in this Complaint have been carried out in this District.

15. This Court has personal jurisdiction over each Defendant because each Defendant transacted business, and is subject to personal jurisdiction, within the Southern District of Texas. The Defendants have sold CPPs to consumers located in the Southern District of Texas during the Class Period.

16. At all material times, the Defendants sold CPPs to customers across the United States, operating in a continuous and uninterrupted flow of commerce across state lines. Defendants' conduct has substantially affected interstate commerce.

## CLASS ALLEGATIONS

17. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and the following class (the "Class"):

> All persons and entities in the United States (excluding Defendants, their parents, predecessors, successors, subsidiaries, and affiliates as well as federal government entities) that directly purchased CPPs from any of the Defendants or their co-conspirators at any time during the period from June 1, 2014 through the present (the "Class Period.").

18. Members of the Class are so numerous that joinder is impracticable. The Class includes thousands of consumers throughout the United States.

19. There are many questions of law and fact common to the class, including:

    (a) whether Defendants colluded to fix, maintain, or stabilize the price of CPPs in the United States;

4

  (b) when each Defendant joined the price-fixing conspiracy;

  (c) whether Defendants' conduct fixed, maintained, or stabilized the price of CPPs in the United States;

  (d) whether Defendants' conduct constitutes a per se violation of the Sherman Act; and

  (e) the extent to which Defendants' conduct caused Plaintiff and members of the Class to pay supra-competitive prices for CPPs and to suffer antitrust injuries as a result.

These and other common questions of law and fact predominate over any questions affecting only individual Class members.

 20. Plaintiff's claims are typical of the claims of the Class because all Class members suffered antitrust injuries in the same way as a result of Defendants' wrongdoing, and the claim of each Class member arises out of the same essential facts and is based on the same legal theory.

 21. Plaintiff will fairly and adequately represent and protect the interests of the Class.

 22. Plaintiff has retained counsel experienced in class action antitrust litigation, and Plaintiff has no interest that conflicts with the interests in this litigation of the other members of the Class.

 23. A class action is superior to any other available method for the fair and efficient adjudication of this controversy. Plaintiff knows of no management difficulty that would preclude class certification.

## OVERVIEW OF THE CPP INDUSTRY

 24. According to the Promotional Products Association International, the promotional products industry sold $21.3 billion in the United States during 2016.

 25. Common promotional items include pens, calendars, T-shirts, coffee mugs, key chains, badge holders, wristbands, lanyards, and pin buttons.

26. Businesses often use customized promotional items by distributing them at trade shows, providing them to customers to further brand loyalty, or furnishing them to their own employees as gifts. Individuals also buy customized promotional items for many purposes, including to contribute money to charitable organizations such as NFF or to increase awareness of a cause.

27. Starting in the early 2000s, much of the ordering for promotional products moved to the Internet. Online ordering allowed customers to compare prices for a given type of customizable promotional item according to their specific needs. The trend intensified the pressure for companies producing CPPs to compete on price, speed of delivery, and product features and quality.

28. Demand for silicone gel wristbands soared after 2004, when Nike and the Livestrong Foundation, cycling champion Lance Armstrong's cancer charity, launched a yellow silicone gel wristband with the imprint "LIVESTRONG" as a symbol for cancer awareness. The Livestrong Foundation eventually sold over 80 million wristbands.

29. Silicone wristbands are manufactured by compressing extruded silicone rubber to a pre-selected width (most commonly one-half inch). The rubber is pre-dyed, and the customer can select whether he or she wants the customized printing to be debossed (recessed), embossed (raised), colored debossed, or screen-printed, among other options. Most silicone wristbands are 7 or 8.5 inches in circumference, are approximately one-tenth of one inch thick, and are heavily standardized across the industry.

30. The production of customized lanyards is very similar to that of customized silicone wristbands, but most lanyards are made from polyester, nylon, or other easy-to-produce synthetic materials rather than silicone. The customer can select the type and style of printing

6

and other standard aspects of production, including the clasp and the badge holder. The turnaround time for lanyards is generally short (similar to that of customized silicone wristbands), and they can be ordered on little notice, often shipped from countries in Asia.

31. Customized pin buttons are buttons or badges that attach to an article of clothing using an attached safety pin. Most pin buttons are flat or rectangular, and they carry images or messages. Customized pin buttons are produced in a method very similar to the methods for manufacturing customized silicone wristbands and lanyards. The pins are standardized across a range of options, such as size and shape, with a front message or image that can be chosen almost entirely by the customer. While some customized pin buttons are installed on keychains or have magnetic backings instead of using safety pins, they are all considered to be "customized pin buttons" within the industry meaning of the term. The turnaround times for customized pin buttons are also generally quick, and they can be ordered on little notice, also often shipped directly from countries in Asia.

32. Most production facilities are located in China or other countries in Asia where production can occur very quickly, and the products can be rapidly shipped to the United States. But some production is done in the United States, and Defendants (and other competitors) often charge a premium for Customized Promotional Products that they claim to be "Made in the USA."

33. At least one Defendant, Zaappaaz, owns manufacturing facilities that are strategically located in China close to an airport to facilitate expedited delivery of their products.

34. Examples of CPPs (from a Zaappaaz website) appear below:

  

35. All corporate Defendants' ordering systems for customized silicone wristbands and/or lanyards are highly similar. In a typical order, a customer chooses a type of printing (e.g., printed, debossed, or embossed), a width, a color, a customized message, a logo or other image, a method of bagging, and the type or speed of shipping and/or production. Customized pin buttons use a pre-set selection of sizes and shapes of buttons, upon which a custom image or message is printed.

36. For each of the Defendants' websites, the prices for the CPPs – whether it be silicone wristbands, lanyards, or pin buttons – are clearly quoted at the bottom of the ordering screen. It is easy for customers to compare prices across websites by entering similar, or identical, orders on each website.

37. Because of the low cost of manufacturing and shipping and the ease of ordering online and comparing offers from different vendors, prices would be low in the absence of collusion among the Defendants.

38. Defendants' anticompetitive actions resulted in supra-competitive prices and profits at the expense of consumers of promotional products.

## THE PRICE-FIXING CONSPIRACY

39. Defendant Makanojiya has asserted that in 2007, while a student at the University of Houston, he saw at a trade show in China how customized silicone wristbands could be mass-produced. Inspired by the Livestrong wristbands, he created Wrist-Band.com.

40. Defendant Netbrands was also started in 2007. Its founders were Defendant Ahmed, Aziz Mansoor, and Mueen Akhter.

41. In 2010, Netbrands sued Zaappaaz, Makanojiya, and several of Makanojiya's family members who were involved with Zaappaaz, alleging that they, along with a company they hired in India, had submitted fake orders on Netbrands's website to figure out how Netbrands's ordering process worked. Netbrands alleged that the purpose of this trickery was to allow Zaappaaz to duplicate that ordering process on its website and then to offer products and services similar to Netbrands's on its own website. The Netbrands complaint alleged that Zaappaaz copied large parts of its website, including images, and that Zaappaaz offered the same or substantially similar services and products at prices 30-40 percent below the Netbrands prices.

42. Although the case settled (in 2011), the contact provided an opportunity for the erstwhile competitors to become price-fixers.

43. From at least 2014 through at least June 2016, Defendant Zaappaaz's personnel, and specifically Makanojiya, attended meetings and communicated through online messaging platforms (e.g., Facebook, Skype, and WhatsApp) with other Defendants to fix the prices of CPPs.

44. From at least June 2014 through at least June 2016, Defendant Custom Wristbands's personnel, and specifically Angeles, attended meetings and communicated in person and online through text messaging and online messaging platforms with other Defendants to fix the prices of CPPs.

45. In March 2016, a Houston-based silicone wristband seller, Victor Rey, who owns a company called Wristband Connection (the "Whistleblower") was approached about joining the cartel by Defendants Ahmed (Netbrands) and Kurji (Brandeco) through text and Facebook messages.

46. Defendant Kurji (Brandeco) told the Whistleblower that Brandeco, Custom Wristbands, Netbrands, and Zaappaaz had all agreed to fix prices rather than compete. The Whistleblower notified the government about the communication and agreed to wear a wire to record conversations with Defendants Ahmed, Kurji, and Makanojiya.

47. In recorded conversations with the Whistleblower, Defendants Ahmed, Kurji, and Makanojiya discussed pricing, the private WhatsApp group that was used to discuss pricing, and the restaurants where they would meet to agree on pricing.

48. In June 2016, the Federal Bureau of Investigation conducted simultaneous raids of the offices of Netbrands, Brandeco, and Zaappaaz.

49. Based on information obtained from its investigation, the FBI had reason to believe that Defendant Casad was involved in the cartel. In July 2017, the FBI investigated Defendant Casad's offices for seven hours.

50. In November 2017, Defendants Zaappaaz and Makanojiya pleaded guilty in the Southern District of Texas to violating the Sherman Act by conspiring with other CPP companies to fix prices. Zaappaaz agreed to pay a $1,923,245 fine as part of the plea deal.

51. In December 2017, Defendants Custom Wristbands and Angeles pleaded guilty in the Southern District of Texas to violating the Sherman Act by conspiring with other CPP companies to fix prices. Custom Wristbands agreed to pay a $409,342 fine as part of the plea deal.

**RELEVANT MARKET**

52.     Defendants' horizontal price fixing is a per se violation of Section 1 of the Sherman Act. Therefore, Plaintiff is not required to define a relevant market.

53.     Defendants operate websites which advertise and sell CPPs throughout the United States using online platforms.

54.     Defendants' market share for CPPs is not specifically known because marketing information sufficient to determine market share is unknown or unpublished. But Defendants Brandeco, Gennex, Casad, Custom Wristbands, Netbrands, and Zaappaaz all claim to be a leaders in the industry and, upon information and belief, collectively they possess a high market share in the CPPs industry.

55.     There are no reasonably available substitutes for CPPs that are ordered online and manufactured to a customer's specifications then shipped directly to the customer. If a customer could find a local business willing to create comparable CPPs, they would be far more expensive than those mass produced using modern high-technology equipment and sold by the Defendants.

56.     As a result of their anticompetitive agreements, the Defendants sell CPPs at prices well in excess of their marginal costs and the competitive price. The Defendants have enjoyed artificially high profit margins, especially when compared with online retailers of other types of mass-produced consumer goods.

**INTERSTATE COMMERCE**

57.     Defendants manufactured and/or sold CPPs in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

58.     Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

## HARM TO COMPETITION DUE TO THE CONSPIRACY

59. The anticompetitive conduct described in this Complaint enabled Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class. This harm to the Plaintiff and other Class members, in the form of paying artificially inflated prices for CPPs, constitutes cognizable antitrust injury and harm to competition under the antitrust laws.

60. There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, and even if there were, there are less restrictive means of achieving any such purported procompetitive effects. To the extent that Defendants' anticompetitive conduct, or any aspect of their conspiracy, has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

## ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

61. During the Class Period, Plaintiff and members of the Class purchased CPPs directly from Defendants. Defendants' anticompetitive conduct alleged herein caused members of the Class to pay prices for CPPs that were inflated above competitive levels during and throughout the Class Period.

62. If Defendants had not conspired with one another to fix prices, Plaintiff and members of the Class would have paid substantially lower prices for CPPs during and throughout the Class Period.

63. Because Defendants were successful in price fixing, Plaintiff and members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

64. Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct.

65. On information and belief, Defendants' anticompetitive conduct and its effects are continuing, and so are the overcharges suffered by Plaintiff and the Class caused by Defendants' conduct.

66. The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## **CLAIM FOR RELIEF**

### **Violation of Section 1 of The Sherman Antitrust Act (15 U.S.C. § 1)**

67. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

68. As set forth above, Defendants were competitors in the market for CPPs.

69. In violation of Section 1 of the Sherman Act, Defendants entered into agreements with one another to fix, maintain and stabilize the prices of CPPs at supra-competitive levels, specifically customized silicone wristbands, customized lanyards, and customized pin buttons. This horizontal price-fixing conspiracy is a per se violation of the Sherman Act.

70. Each Defendant committed at least one overt act, such as arranging with a competitor to set the price of CPPs, to further the conspiracy alleged herein.

71. As a result of Defendants' unlawful conduct, prices for CPPs were raised, fixed, maintained, and/or stabilized at supra-competitive levels in the United States.

72. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

73. For the purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

    (a) participating in meetings and conversations to discuss each other's CPPs business; and

    (b) fixing, stabilizing, maintaining, or setting prices for CPPs at supra-competitive levels.

74. As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for CPPs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. Judgment in favor of Plaintiff and the Class he seeks to represent and against Defendants; and damages, measured as the overcharges that Plaintiff and other members of the Class paid as a result of Defendants' anticompetitive conduct, trebled;

C. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

D. Injunctive relief to prevent further anticompetitive conduct;

E. Costs of suit, including reasonable attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues so triable.

| | |
|---|---|
| Dated: March 20, 2018 | SUSMAN GODFREY L.L.P. |

*/s/ Barry Barnett*
Barry Barnett
*Attorney in Charge*
State Bar No. 01778700
S.D. Tex. Bar No. 02607
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: 713-651-9366
Facsimile: 713-654-6666

OF COUNSEL:
Scott Fulford
Susman Godfrey L.L.P.
State Bar No. 24083033
S.D. Tex. Bar No. 3132453
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: 713-651-9366
Facsimile: 713-654-6666

Joshua H. Grabar
Grabar Law Office
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Telephone: 267-507-6085
Facsimile: 267-507-6150

Marc H. Edelson
Edelson & Associates
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: 215-867-2399

**Attorneys for Plaintiff**
**Timothy Hayden**